Dorothy HOOTS, individually and as mother of her children, Janelle Hoots and Jamie Hoots; Mrs. Addrallace Knight, individually and as mother and natural guardian of her children Ronald Knight, Loretta Knight, Terrance Knight, Marc Knight and Byron Knight; Barbara Smith, individually and as mother and natural guardian of her children Tawanda Smith, Tevela Smith, Joseph Smith, Wesley Smith and Eric Smith; on behalf of themselves and all others similarly situated; Mae Helen Woody, Juanita Jordan

v.

COMMONWEALTH OF PENNSYLVANIA; Edward X. Hallenberg, President of the Allegheny County Board of School Directors; the Allegheny County Board of School Directors; W. Deming Lewis, Chairman of the Pennsylvania State Board of Education; Michael Sullivan, President of the School District of the Borough of Braddock, the School District of the Borough of Braddock, Andrew Lisyak, President of the School Board of the School District of the Borough of Rankin; the School District of the Borough of Rankin, Leo Campbell, President of the School Board of the School District of the Borough of North Braddock; and the School District of the Borough of North Braddock; the Allegheny Intermediate Unit Board of School Directors and Edward X. Hallenberg as President of the Allegheny Intermediate Board of School Directors, Churchill Area School District, Edgewood School District, Swissvale Area School District, Turtle Creek Area School District.

Appeal of SCHOOL DISTRICT OF EDGEWOOD, in 81–1691.

Appeal of SCHOOL DISTRICT OF CHURCHILL AREA, in 81–1692.

Appeal of SCHOOL DISTRICT OF SWISSVALE AREA, in 81–1693.

Appeal of SCHOOL DISTRICT OF TURTLE CREEK AREA, in 81–1694.

Appeal of SWISSVALE AREA SCHOOL DISTRICT, Churchill Area School District, Edgewood School District and Turtle Creek Area School District, in 81–1695.

Appeal of SCHOOL DISTRICTS OF CHURCHILL AREA, EDGEWOOD,

SWISSVALE AREA AND TURTLE CREEK AREA, in 81–1790.

Appeal of ALLEGHENY COUNTY INTERMEDIATE UNIT and Allegheny County School Board, in 81–1986.

Appeal of COMMONWEALTH OF PENNSYLVANIA, W. Deming Lewis, Chairman of the Pennsylvania State Board of Education and the Pennsylvania State Board of Education, in 81–1987.

Appeal of Edward HALLENBERG, in 81–1988.

Nos. 81–1691 to 81–1695, 81–1790 and 81–1986 to 81–1988.

United States Court of Appeals, Third Circuit.

Argued Dec. 18, 1981.
Decided Feb. 1, 1982.

Thomas A. Gottschalk (argued), Washington, D. C., for School Dist. of Edgewood and Turtle Creek Area.

Carl W. Brueck, Brueck & Houck, Pittsburgh, Pa., for School Dist. of Edgewood.

Philip B. Kurland (argued), Chicago, Ill., John J. Coffey, Philadelphia, Pa., Roths-

child, Barry & Myers, Chicago, Ill., J. Robert Maxwell, Maxwell & Huss, Pittsburgh, Pa., for School Dist. of Churchill Area.

Frank Goodman (argued), Philadelphia, for Swissvale Area School Dist.

Allen C. Warshaw, Deputy Atty. Gen., Chief, Civ. Litigation (argued), Harrisburg, Pa., Alton P. Arnold, Jr., William A. Webb, Deputy Atty. Gen., LeRoy S. Zimmerman, Atty. Gen. for the Com. of Pa., Harrisburg, Pa., for Com. of Pa., State Bd. of Ed. and W. Deming Lewis.

Anton W. Bigman (argued), Pittsburgh, Pa., Linda A. Blumkin, Fried, Frank, Harris, Shriver & Jacobson, New York City, for General Braddock Area School Dist.

Thomas J. Henderson (argued), Pittsburgh, Pa., Jack Greenberg, James M. Nabrit, III, James S. Liebman (argued), Neighborhood Legal Services, New York City, for Dorothy Hoots, etc., et al.

G. N. Evashavik, Evashavik, Capone, Evans & Della Vecchia, Pittsburgh, Pa., Robert H. Bork, New Haven, Conn., Kirkland & Ellis, Washington, D. C., for Turtle Creek Area School Dist.

J. Frank McKenna, III, Thorp, Reed & Armstrong, Pittsburgh, Pa., for East Allegheny School Dist.

Michael I. Levin, Cleckner & Fearen, Harrisburg, Pa., amicus curiae, Pa. School Boards Assn.

Thomas Rutter, William C. Andrews, Goehring, Rutter & Boehm, Pittsburgh, Pa., for Edward X. Hallenberg and Allegheny Intermediate Unit, Allegheny County School Bd.

Before GIBBONS, HUNTER and GARTH, Circuit Judges.

## OPINION OF THE COURT

JAMES HUNTER, III, Circuit Judge.

This decision is the ninth chapter in the history of this decade-old school desegregation case.[1] The plaintiff class consists of

1. The other decisions are: *Hoots v. Commonwealth of Pennsylvania*, 334 F.Supp. 820 (W.D. Pa.1972) ("*Hoots I*"); *Hoots v. Commonwealth of Pennsylvania*, 359 F.Supp. 807 (W.D.Pa.

parents of children who attend public schools in the General Braddock Area School District ("GBASD") in Allegheny County, Pennsylvania. Defendants are the Commonwealth of Pennsylvania, the Pennsylvania State Board of Education (the "State Board"), the Allegheny Board of Education (the "County Board," later succeeded by the "Intermediate Unit"), and several of the Boards' officers. Plaintiffs filed a complaint on June 9, 1971, alleging that the consolidation of various school districts in Allegheny County by the Commonwealth of Pennsylvania, acting through the State and County Boards, had resulted in the creation of racially segregated schools. The district court, in *Hoots II*, held that the creation of GBASD by the State and County Boards was "an act of *de jure* discrimination in violation of the Fourteenth Amendment." *Hoots II*, 359 F.Supp. at 823. Various plans were considered by the district court as possible remedies for the continuing violations of plaintiffs' constitutional rights. In March 1981, the court decided which of numerous school districts could be included in any multidistrict remedy under the guidelines of *Milliken v. Bradley*, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974). *Hoots VI*, 510 F.Supp. at 619. In April 1981, the district court approved the consolidation plan presently under appeal.[2]

Defendants' present appeal is based on two contentions. First, they argue that *Hoots II*, in which the district court found a constitutional violation, was incorrectly decided, in that the district court did not find *intentional* or *purposeful* segregative acts on the part of state officials. Second, defendants contend that the district court erred in fashioning the multidistrict remedy that it ultimately chose.

We find defendants' arguments unpersuasive and we affirm the rulings of the district court.

## I. FACTS AND PROCEDURAL HISTORY

The facts of this case, especially those which lead to the initial filing of the complaint in this action, are ably and extensively set forth in the district court's May 1973 opinion. *See Hoots II*, 359 F.Supp. 807. The procedural posture of the case has been recited on numerous occasions by this court: *Hoots IV*, 587 F.2d 1340; *Hoots V*, 639 F.2d 972. Here, we will summarize those accounts and then supplement them with a recital of subsequent events leading to the instant appeal.

During the 1960's, the Commonwealth of Pennsylvania on three occasions enacted legislation to reorganize the school districts in Pennsylvania's public school system. The Act of September 12, 1961, P.L. 1283, No. 561, 24 P.S. § 2–281 *et seq.* ("Act 561"), directed each county board of school directors to prepare a plan of organization of school districts for the county for review by the State Board of Education. This Act was superseded, although not substantively altered, by the Act of August 8, 1963, P.L. 564, No. 299, 24 P.S. § 2–290 *et seq.* ("Act 299"), and the Act of July 8, 1968, P.L. 299, No. 150, 24 P.S. § 2400.1 *et seq.* ("Act 150"). Act 299 instructed the county boards to prepare on or before July 1, 1964 a plan of organization of school districts for the county and directed the State Board of Education to review organization plans prepared by the county boards and to approve such plans as it deemed wise and in the best

1973) ("*Hoots II*"); *Hoots v. Commonwealth of Pennsylvania*, 495 F.2d 1095 (3d Cir.), *cert. denied*, 419 U.S. 884, 95 S.Ct. 150, 42 L.Ed.2d 124 (1974) ("*Hoots III*"); *Hoots v. Commonwealth of Pennsylvania*, 587 F.2d 1340 (3d Cir. 1978) ("*Hoots IV*"); *Hoots v. Commonwealth of Pennsylvania*, 639 F.2d 972 (3d Cir. 1981) ("*Hoots V*"); *Hoots v. Commonwealth of Pennsylvania*, 510 F.Supp. 615 (W.D.Pa.1981) ("*Hoots VI*"); *Hoots v. Commonwealth of Pennsylvania*, (W.D.Pa., 71–258, April 16, 1981) ("*Hoots VII*"); *Hoots v. Commonwealth of*

*Pennsylvania*, (W.D.Pa., 71–258, April 28, 1981) ("*Hoots VIII*").

In addition, we have denied plaintiffs' applications for writ of mandamus on two occasions. *Hoots v. Weber*, No. 79–1474 (3d Cir. May 2, 1979); *Hoots v. Weber*, No. 80–2124 (3d Cir. Sept. 9, 1980).

2. Applications for a stay of *Hoots VIII* have been denied by the district court, this court and the United States Supreme Court (June 29, 1981). *See* Appendix at 3180a, 3181a–3186a.

interest of the educational system of Pennsylvania.

Acts 299 and 150 provided for the plans of organization of school districts to conform to standards which were to be prepared by the State Board. In preparing these standards, the State Board was instructed to take into account: topography, pupil population, community characteristics, transportation of pupils, use of existing buildings, existing administrative units, potential population changes and the capability of providing a comprehensive plan of education. 24 P.S. §§ 2400.1, 2400.2; 24 P.S. §§ 2–291, 2–292. Both Acts also stipulated that no school district should, as a general rule, have a pupil population of fewer than 4,000 students.[3]

The State and County Boards, pursuant to these statutes, established GBASD (63% black) on July 1, 1971, in the central eastern area of Allegheny County, east of Pittsburgh and north of the Monongahela River. The boards also created the predominately or all-white school districts of Turtle Creek (98.1% white), Swissvale (87.3% white), and Churchill (99.2% white), which border on GBASD, and the Edgewood School District (97.8% white), which is situated within approximately one mile of the GBASD. Appendix at 3233a. GBASD served the area consisting of the geographic limits of the Boroughs of Braddock, North Braddock and Rankin. Braddock, North Braddock and Rankin are economically depressed, declining communities. The residents of these municipalities are poor and less educated than those of the other school districts in question. The recreational and shopping facilities within these communities have been rapidly declining and becoming increasingly older in average age. The boroughs of Braddock, North Braddock and Rankin have no characteristics that will attract or retain persons who have the financial means and opportunity to live elsewhere. Finally, the populations of these three communities are becoming increasingly non-white at an accelerated pace. *Hoots II*, 359 F.Supp. at 814 (Findings of Facts 20–27).

Plaintiffs filed this action on June 9, 1971. In December 1971, the district court

---

3. Pursuant to these provisions, the State Board adopted Standards for Approval of Administrative Units. These standards provided, *inter alia*, that:

(a) An administrative unit shall make available an educational program and educational opportunities to meet the varying needs, aptitudes, abilities, and interests of individuals residing in the administrative unit.

(b) Consideration should be given to whether a geographic area has developed the characteristics of a community. Community, as used here, includes one or more municipalities and the surrounding territory from where people came for business, social, recreational, fraternal or similar reasons. Neither race or religion shall be a factor in determining administrative unit boundaries and differences in the social and economic level of the population shall not be a basis to determine these boundaries.

A letter from the Superintendent of the Department of Public Instruction advised the County Boards, including the Allegheny County Board, that the intent of the language of the last sentence of the above paragraph was to prevent *de jure* segregation through the fixing of school district boundaries and that the language was not to be construed to permit *de facto* segregation on the basis of race, religion or national origin which is by law prohibited.

(c) An administrative unit shall utilize existing buildings to the maximum extent practical avoiding unnecessary new construction where possible.

(d) Pupil population changes may be considered in the planning of administrative units where the changes are supported by reliable studies of area development showing past pupil population trends and future projections based on recognized statistical methods.

(e) Consideration shall be given to the capability of providing a comprehensive program of education which shall mean the ability to educate and train each child within his capacity to the extent demanded by the immediate requirements of his growth and his relationship to the strengthening of this Commonwealth and nation, and shall include, but not be limited to, wealth per pupil, qualifications of professional staff, enrollment and diversification of curriculum.

*Hoots II*, 359 F.Supp. at 812–13 (exhibit citations omitted). We note that the parties throughout their briefs and in oral argument have referred to the Standards as the "Section 7(c) issue." Paragraph 7(c) is identical to the verbatim quotation of paragraph 3(b) above. *See* Appendix 319a–20a.

denied defendants' motion to dismiss the complaint for failure to state a cause of action, concluding that "allegations of deliberate creation of racially segregated school districts state a cause of action." *Hoots I*, 334 F.Supp. 820, 822.

The district court also rejected motions by defendants seeking to join involuntarily as defendants the five school districts discussed in the complaint. However, the court stated that it would permit the school districts to intervene voluntarily in the action if they so desired. *Hoots I*, 334 F.Supp. at 823. The school districts did not do so. After the district court "instructed [the Commonwealth] to give notice" of the suit to those school districts, and after the Attorney General of Pennsylvania wrote the five districts urging them "to intervene in this action immediately," the districts informed the court that they had "no interest in being" in the lawsuit, and were "deliberately not intervening." *See Hoots II*, 359 F.Supp. at 821; *Hoots III*, 495 F.2d at 1097; Appendix at 56a–61a, 614a–618a, 2712a, 3383a, 3389a.

On May 15, 1973, the district court held that the State and County Boards' creation of the identifiably black GBASD and the identifiably white Churchill, Edgewood, Swissvale and Turtle Creek districts "constituted an act of *de jure* discrimination in violation of the Fourteenth Amendment." *Hoots II*, 359 F.Supp. at 823. The court ordered the defendants to submit promptly a desegregation plan, to take effect as early as possible, to achieve the greatest possible degree of desegregation within the public schools of the central eastern area of Allegheny County. *Hoots II*, 359 F.Supp. at 824–25. Specifically, the court ordered defendants to "prepare and submit to this Court within 45 days from the date of this Order a comprehensive plan of school desegregation" which "shall alter the boundary lines of the General Braddock Area School District and as appropriate of adjacent and/or nearby school districts." *Id.* at 824. Defendants did not appeal.

In April 1974, after the district court's violation finding in *Hoots II*, Churchill, Edgewood, Swissvale and Turtle Creek petitioned to intervene. The district court granted these petitions insofar as they sought prospective intervention, but denied them insofar as they sought retroactive intervention. Churchill and Turtle Creek appealed this partial denial of their motions. We affirmed the district court, holding that the retroactive intervention petitions were untimely. *See Hoots III*, 495 F.2d 1095, 1097 (3d Cir.), *cert. denied*, 419 U.S. 884, 95 S.Ct. 150, 42 L.Ed.2d 124 (1974).

The defendants did not submit a comprehensive plan of school desegregation within 45 days. In the following years, after granting defendants numerous extensions of time within which to develop effective desegregation plans, the district court found it necessary to reject as inadequate six plans [4] submitted by the Commonwealth and the defendant districts. Five of the plans were interdistrict in nature, and four involved the consolidation of some or all of the school districts presently involved in this case into one or more new school districts. *See Hoots IV*, 587 F.2d at 1344–46; *Hoots V*, 639 F.2d at 975–77; *id.* at 984–86 (Higginbotham, J., concurring).

Plaintiffs appealed twice during the 1973–1980 period. On both occasions they asked this court for a remedial order ending school segregation in central eastern Allegheny County. We dismissed plaintiffs' first appeal in 1978 but we expressed "confiden[ce] that ... an appropriate final order" would "be entered by year end" 1978. *Hoots IV*, 587 F.2d at 1351. In August 1980, after the district court denied plaintiffs' motion for injunctive relief for the second school year since 1978, plaintiffs appealed again. On January 26, 1981, we stated:

> We believe it to be essential that the district court afford relief to [plaintiffs] that will be effective in the fall of 1981. *Under no circumstances should a new school year begin in the fall of 1981 without an acceptable remedial plan in place.*

---

**4.** Plans 22W, A, B and Z, the Tuition Plan and the Upgrade Plan.

Accordingly, we order the district court to expedite its consideration of this case so that within ninety days of the issuance of the mandate of this court it shall:

1) complete all hearings and necessary proceedings on the merits of the competing remedial plans for the desegregation of GBASD;

2) decide the *Milliken v. Bradley* issue of which school districts may be included within an interdistrict remedy; and

3) enter an appropriate final order granting appellants the relief to which they are entitled under the district court's order of May 15, 1973, such relief to be effective and implemented by the beginning of the first semester of the school year in the fall of 1981.

*Hoots V*, 639 F.2d at 980–81 (footnotes omitted) (emphasis added).

On March 5, 1981, the district court entered an opinion and order reaffirming its 1973 interdistrict violation finding. It concluded that the violation involved seven central eastern area school districts (including the five districts involved in this appeal), and determined that a multidistrict remedy involving some or all of those districts was appropriate. *Hoots VI*, 510 F.Supp. at 619.

On April 6, 1981, the district court rejected two remedial plans filed by defendants— the Upgrade Plan and the Tuition Plan— because neither could "achieve effective desegregation." *Hoots VII* at 2, 4; Appendix at 1379a, 1381a. The court concluded that "only an interdistrict remedy is feasible here, and . . . that only a single new district be formed from the consolidation because of the many difficulties presented by plans of consolidation into multiple new districts on which we have heard testimony in prior hearings." *Hoots VII* at 3; Appendix at 1380a. Accordingly, the court ordered hearings on the remedy to be held on April 20, 1981, "solely for the purpose of remedying the constitutional violations found to have been imposed on the plaintiffs here." *Hoots VII* at 4; Appendix at 1381a.

On April 28, 1981, the district court entered its first remedial order. *Hoots VIII*; Appendix at 883a. The court found:

that a New School District composed of the present school districts of Churchill, Edgewood, Swissvale, General Braddock, and Turtle Creek would achieve desegregation of the General Braddock Area School District and would achieve the highest beneficial results over and above the results of any other plan submitted to this Court by any party during the whole period of this litigation.

*Hoots VIII* at 6; Appendix at 889a. The court accordingly ordered

"[t]he Secretary of the Pennsylvania Department of Public Instruction, or his designate, and the Allegheny County Intermediate Unit [to] meet with the Interim Operating Committee of the New School District on or before the 15th day of June, 1981, to design a plan of desegregation and provide for its implementation with the beginning of the 1981–82 school year, and [to] continue such planning until such plan is fully operational within the New School District."

*Hoots VIII* at 17; Appendix at 900a.

After further hearings, the district court entered two orders on July 23 and August 13, 1981, setting forth the details of a plan of desegregation of the New District. That plan was implemented on September 8, 1981. After more than a decade since the filing of the complaint, a remedy for the violation of plaintiffs' constitutional rights was granted them.[5]

## II. DISCUSSION

Defendants' present appeal is based on two grounds. First, defendants argue that the district court erred in holding that the defendants had violated the fourteenth amendment because, they argue, the district court found no intentional or purposeful segregation on the part of state officials. Second, defendants argue that the

---

5. Two related appeals were consolidated with this one by order of this court on August 20, 1981. They are *Hoots v. Commonwealth of* *Pennsylvania*, Nos. 81–2298, 81–2787, 81–2788 and *Hoots v. Commonwealth of Pennsylvania*, No. 81–2732.

district court erred in fashioning a multidistrict remedy. We disagree.

## A. The Constitutional Violation Finding

Defendants' argument regarding the district court's finding of intentional or purposeful segregation is twofold. First, they contend that the district court in *Hoots II* did not properly state a constitutional violation in terms of a "segregative purpose or intent" standard, as is required by the Supreme Court's decision in *Keyes v. School District No. 1*, 413 U.S. 189, 208, 93 S.Ct. 2686, 2697, 37 L.Ed.2d 548 (1973). Second, even if the district court utilized the "purpose or intent" standard, defendants argue that there is no evidence on the record that would justify a constitutional violation finding.

### 1. The Segregative Purpose or Intent Legal Standard

It is not disputed that *Keyes* was the first Supreme Court decision to articulate the requirement of proof of segregative intent or purpose to establish a *prima facie* case of *de jure* school segregation in a northern state without a history of segregation statutes. 413 U.S. at 208, 93 S.Ct. at 2697. Although *Hoots II* was decided prior to *Keyes*, so that the district court could not possibly have tracked the language of that case, we find that the district court in *Hoots II* satisfied the requirement of proof of intentional or purposeful segregation.

The *Keyes* decision did not simply require proof of intent or purpose; it also held that the requisite intent or purpose can be established by inference, as well as by direct proof. 413 U.S. at 201, 208–09, 93 S.Ct. at 2694, 2697–98. The *Keyes* doctrines were amplified in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), where the Court explained that proof of segregative intent or purpose may be accomplished in various ways, and to varying degrees, and still satisfy the dictates of *Keyes*:

> [The requirement of] [proof of racially discriminatory intent or purpose] does *not* require a plaintiff to prove that the challenged action rested *solely* on racially discriminatory purposes. Rarely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern, or even that a particular purpose was the "dominant" or "primary" one.
>
> Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such *circumstantial and direct evidence of intent as may be available.* The impact of the official action—whether it "bears more heavily on one race than another," *Washington v. Davis*, [426 U.S. 229,] 242 [96 S.Ct. 2040, 2049, 48 L.Ed.2d 597] [(1976)]—may provide an important starting point. Sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face....

429 U.S. at 265–67, 97 S.Ct. at 563–64 (emphasis added) (citation omitted).

Proof of segregative purpose or intent was again discussed in *Columbus Board of Education v. Penick*, 443 U.S. 449, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979), where the Supreme Court re-explained the meaning of segregative intent in the context of school desegregation cases:

> [T]he District Court correctly noted that *actions having foreseeable and anticipated disparate impact are relevant evidence to prove the ultimate fact, forbidden purpose. Those cases do not forbid "the foreseeable effects standard from being utilized as one of the several kinds of proofs from which an inference of segregative intent may be properly drawn."* Adherence to a particular policy or practice, "with full knowledge of the predictable effects of such adherence upon racial imbalance in a school system is one factor among many others which may be considered by a court in determining whether an inference of segregative intent should be drawn."

443 U.S. at 464–65, 99 S.Ct. at 2949–50 (emphasis added) (citations omitted).

Bearing in mind that proof of segregative intent or purpose can be accomplished in a number of ways, we turn to an examination of the record. The first indication that the district court was using an appropriate constitutional standard was in *Hoots I*, in which it denied defendants' motion to dismiss plaintiffs' complaint for failure to state a cause of action. The court explicitly emphasized that plaintiffs' complaint contained allegations that "[i]n preparing and adopting the school reorganization plans defendants *intentionally and knowingly created racially segregated school districts . . . ."* *Hoots I*, 334 F.Supp. at 821–22 (emphasis added). From the very beginning of this lawsuit, then, it has been clear that the district court was couching the issues in terms of intentional segregation. And, in *Hoots II*, after full trial, the district court stated conclusions of law which demonstrate that the court was addressing questions of intent and purpose.[6] For example:

A violation of the Fourteenth Amendment has occurred when public school authorities have made educational policy decisions which were *based wholly or in part on considerations of the race of students* and which contributed to increasing racial segregation in the public schools.

School authorities may not, consistent with the Fourteenth Amendment, maintain segregated schools or permit educational choices contributing to the development and growth of segregated schools *because of community sentiment or the wishes of a majority of voters.*

*Hoots II*, 359 F.Supp. at 822 (emphasis added) (citations omitted). This is the language of intention and purpose.

That the district court used the appropriate legal standard (*i.e.*, that the court was looking to segregative purpose or intent) in reaching its violation finding is established beyond cavil when we analyze certain factual conclusions by the district court. Some examples are:

(1) "Because the *State and County Boards in devising this plan* of organization of administrative units for the central eastern portion of Allegheny County *were influenced by* the desires of the surrounding municipalities to avoid being placed in a school district with Braddock and Rankin because of the high concentration of blacks within these two municipalities, *race was a factor*, at least indirectly, in the formation of the school district composed of Braddock, North Braddock, and Rankin." *Hoots II*, 359 F.Supp. at 821, reaffirmed in *Hoots VI*, 510 F.Supp. at 619 (emphasis added).

(2) "[T]he record contained no evidence showing that the school district boundaries established in the plan of organization of administrative units are rationally related to any legitimate purpose and the court found that those boundaries did not promote any valid state interest." *Hoots VI*, 510 F.Supp. at 619, reaffirming *Hoots II*, 359 F.Supp. at 821, 822.[7]

(3) The court noted that "the history of the reorganization of school district boundaries in the central eastern portion of Allegheny County pursuant to Acts 561, 299 and 150," revealed that the County Boards had acted over a period of years with the intention of guarding the white communities from Rankin, Braddock and North Braddock. *See Hoots VI*, 510 F.Supp. at 619, reaffirming *Hoots II*, 359 F.Supp. at 811–13, 816–17.

---

6. Indeed, courts looked for intentional segregation in segregation cases well before *Keyes* required them to do so. *See, e.g., Sealy v. Department of Public Instruction*, 252 F.2d 898, 901 (3d Cir. 1958). *Accord, Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 17–18, 91 S.Ct. 1267, 1276–77, 28 L.Ed.2d 554 (1971), expressly reaffirmed in *Keyes*, 413 U.S. at 208 & n.16, 93 S.Ct. at 2697 & n.16, and cited in *Hoots II*, 359 F.Supp. at 823–24.

7. In *Columbus Board of Education, supra,* the Supreme Court stated that "a series of Board actions and practices that cannot reasonably be explained without reference to racial concerns" and that causes "racial separation in the schools" strongly evidences intentional discrimination. 443 U.S. 461–62, 99 S.Ct. at 2948–49.

(4) "The natural, foreseeable and actual effect of [the Boards' decisions] was to perpetuate, exacerbate and maximize racial segregation within the public schools of the central eastern portion of Allegheny County." *Hoots II*, 359 F.Supp. at 821, reaffirmed in *Hoots VI*, 510 F.Supp. at 618.

We have on other occasions followed the Supreme Court's reasoning that "proof of foreseeable consequences is one type of quite relevant evidence of racially discriminatory purpose." *Dayton Board of Education v. Brinkman II*, 443 U.S. 526, 536 n.9, 99 S.Ct. 2971, 2978 n.9, 61 L.Ed.2d 720 (1979); *C.F. Richardson v. Pennsylvania Department of Health*, 561 F.2d 489, 492 (3d Cir. 1977), *citing Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), and *Arlington Heights, supra*.

Finally, after having intent language in *Keyes* and *Milliken* brought to its attention, the district court explicitly reaffirmed its violation conclusion based on findings of purposeful official segregation. For example, in 1975, after the former districts filed motions to dismiss based on the alleged absence of "deliberate purposeful intent to segregate or invidiously discriminate or create a dual system ... (as required by *Brown* through *Keyes* and *Milliken*)," the district court reopened the violation issue and permitted the districts to present testimony "by the State Board explaining actions [in the 1960's] that may have appeared to be racially motivated" but assertedly were not. Appendix at 2673a, 2799a. After hearing argument, the district court rejected appellants' contentions, based in part on State Board chairman Paul Christman's admission that Board members "knew they were heading into a segregation problem" in the central eastern area. Appendix at 2737a, 2762a. When counsel for Churchill School District argued that the district court "would have come to a different conclusion [in *Hoots II*] if [it] were making [its] order ... after *Keyes*," Chief Judge Weber stated: "This is one place where you

can say [you are] 100 percent wrong." Appendix at 2739a. The court then reaffirmed its earlier holding that the Board had "purposefully" segregated GBASD. Appendix at 2761a.

Furthermore, the court, in its November 11, 1979 Memorandum Order, indicated that the plaintiffs had established: that "segregative intent" had been demonstrated, Appendix at 3201a–3202a; that "racially discriminatory acts of the state have been a substantial cause of interdistrict segregation," *Hoots VI*, 510 F.Supp. at 619; that "district lines have been deliberately drawn on the basis of race," *id.* at 616, *quoting Milliken*; and that GBASD was "intentional[ly] creat[ed] as a racially identifiable school district," *Hoots VIII* at 9; Appendix at 892a.

■ In short, there is no question that the district court utilized the correct legal standard—intentional or purposeful segregation. Obviously, it could not, in *Hoots II*, have cited the exact language of the forthcoming *Keyes* opinion. That does not mean, however, that *Hoots II* does not comply with the standards enunciated in *Keyes*, and we hold today that *Hoots II* did comply with those standards.

### 2. The Factual Evidence of Segregative Purpose or Intent

Having decided that the district court used the correct legal standard, we now turn to the question of whether the court's finding of intentional racial segregation, based on the evidence it cited, was clearly erroneous under Fed.R.Civ.P. 52(a).[8]

■ For an appellate court to find that a trial court's conclusion was clearly erroneous, the reviewing court must be "left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). The Supreme Court has also cautioned that adherence to this standard of review is par-

---

**8.** Rule 52(a) provides, in part: "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportuni-

ty of the trial court to judge the credibility of the witnesses."

ticularly important in a desegregation case because of the trial court's "proximity to local [school] conditions." *Brown v. Board of Education II*, 349 U.S. 294, 299, 75 S.Ct. 753, 756, 99 L.Ed. 1083 (1955), and because the trial court's "[f]indings as to design, motive and intent . . . depend [so] peculiarly upon the credit given to witnesses by those who see and hear them." *United States v. Yellow Cab Co.*, 338 U.S. 338, 341–42, 70 S.Ct. 177, 179–80, 94 L.Ed. 150 (1949).

The heavy burden on a party attempting to overcome the clearly erroneous standard in a case of this nature was stated recently by Chief Justice Burger, concurring in *Columbus*:

> Like Mr. Justice Rehnquist, I have serious doubts as to how many of the post-1954 actions of the Columbus Board of Education can properly be characterized as segregative in intent and effect. *On this record I might very well have concluded that few of them were. However, like Mr. Justice Stewart, I am prepared to defer to the trier of fact because I find it difficult to hold that the errors rise to the level of "clearly erroneous" under Rule 52.* The District Court did find facts sufficient *to justify the conclusion reached by Mr. Justice Stewart that the school "district was not being operated in a racially neutral manner" and that the Board's actions affected "a meaningful portion" of the school system. *Keyes v. School Dist. No. 1, Denver, Colo.*, 413 U.S. 189, 208 [93 S.Ct. 2686, 2697, 37 L.Ed.2d 548] (1973).

443 at 468, 99 S.Ct. at 2952 (emphasis added).

█ In the briefs and in oral argument plaintiffs have explicated much of the direct and circumstantial evidence relied upon by the district court in reaching its violation determination. We will recite some of that evidence here. All of the following examples were cited and relied upon by Chief Judge Weber in *Hoots II*, 359 F.Supp. at 816–17:

(1) There was in evidence a letter to the County Board in 1964 from a Mrs. Ryland, a resident of Turtle Creek, requesting the Board to shield the white children of Turtle Creek from "colored people [of] the kind that live in North Braddock, Braddock, and Rankin." Appendix at 300a.

(2) There was in-court testimony by a central eastern area municipal official, Joseph D. Suley, admitting that he and his colleagues had pressured State and County Board members in the 1960's to insulate their municipalities (Braddock Hills, Turtle Creek and East Pittsburgh were mentioned by name) from merger with Braddock and Rankin because of "the black issue" and because of the "bitterness" felt by "whites" towards "blacks" in the area. Appendix at 118a–126a.[9]

(3) There was in evidence a suggestion in a 1965 State Board Staff report that "the non-white population . . . factor" contributed to certain municipalities' "opposition" to proposals to merge all those districts with Braddock and Rankin. After noting Turtle Creek's and East Pittsburgh's objections to merger with Braddock and Rankin, and North Braddock's objections to merger with Turtle Creek, the staff report stated that "the non-white population is *not* a factor in opposition to *Turtle Creek since* the percent of *non-white* is as follows: Braddock 55%, Rankin 51%, Braddock Hills 10%, East Pittsburgh 20%, North Braddock 10%, *Turtle Creek none.*" (Emphasis added.) Appendix at 310a, 699a. The point is clearly that one

9. Defendants argue that Mrs. Ryland's letter should not have been admitted and that significant portions of Suley's testimony were hearsay. Our review of the record reveals no timely objections by the defendants, but does disclose that at the *end* of Suley's testimony, a motion to strike was made. Appendix 149a. The district court reserved ruling on the motion, but ultimately did not grant it.

On appeal, defendants argue that the district court erred in failing to grant the motion to strike, and that the district court was clearly erroneous insofar as it inferred segregative intent from Suley's testimony and Mrs. Ryland's letter. Assuming without deciding that the motion to strike was properly presented to the district court at least with respect to Suley's testimony, we find no merit to the defendants' argument.

of the *reasons* that Turtle Creek's inclusion in the merger was not objectionable was because it had no "non-whites." The implication is that a high non-white factor would be a reason against a district's inclusion.

(4) There was an admission under oath by State Board Chairman Dr. Paul Christman that he approved the isolation of Braddock, Rankin and North Braddock from all its neighbors in 1965 despite his recogn[ition] of "a black-white factor there that was improperly dealt with ..." He noted that the situation could "become even worse than it was at the time ... in terms of [the] growth of percentage of blacks in those communities ..." Appendix at 2702a–2703a.

(5) There was in evidence a statement in a 1964 brief by Braddock Hills officials to the County Board which attributed the Board's refusal to merge Churchill with any of its neighbors to political pressure from Churchill "based on politics, race, color, or creed ..." Appendix at 588a.

(6) There was in evidence a letter to State and County Board members signed by Thomas A. Harper, a Braddock School Board member, and LaRue W. Frederick, the President of the area NAACP chapter, attributing neighboring municipalities' opposition to merger with Braddock and Rankin to fear of an "influx of a large number of Negro students into heretofore predominantly white units" and of the placement of "Negroes on the School Board [and in] professional and non-professional [staff positions] in the school system." Appendix at 592a–593a.

(7) There was in evidence a statement made by County Board President L. W. Early during hearings in 1968 on North Braddock's appeal that "we are painfully aware of [the fact] that ... over the years the surrounding school districts had sought to avoid a school merger which would include Braddock and Rankin in their school district and that it looked like Braddock was going to be 'left holding the bag.'" Appendix at 701a.

(8) There was in evidence a statement by a County Board member "call[ing] attention to the fact that the socio-economic factors involved in Turtle Creek—East Pittsburgh make it a homogeneous unit." Appendix at 308a.

(9) Dr. John Finger, plaintiffs' educational expert, testified that, in his professional opinion, it was possible to "infer from some of the [public] documents that ... race, indeed, was taken into consideration" by public officials "in recreating school districts," and that those officials "exclude[d] Rankin and North [Braddock] and Braddock from consolidation with neighboring white districts "because they are black." Appendix at 230a, 237a–38a.

In addition to specific pieces of direct evidence of segregative intent or purpose, we have already noted that the district court properly relied on circumstantial or "objective" evidence in *Hoots II. See* pp. 1117–1118 *supra.* The district court, for example, considered it significant that the Boards' redistricting plan disregarded statutory and administrative reorganization standards, *e.g.,* the statutory 4000 pupil minimum guideline, the requirement that existing facilities be used where possible, the requirement of racial and cultural diversity, and the requirement that each district be capable of providing a comprehensive educational program. *See Hoots II,* 359 F.Supp. at 819–20.

◼ Furthermore, the district court properly weighed evidence such as the Board members' admitted knowledge that their redistricting decisions would cause and perpetuate segregation, the foreseeability of the segregative result, the Boards' formulation of boundaries that promoted no interest other than racial segregation, the Boards' rejection of alternative school district configurations in favor of a segregation-maximizing alternative, and the State Board's blatantly improper interpretation of its own "race regulation" to endorse the very evil the regulation was designed to prevent.[10] *Hoots II,* 351 F.Supp. at 819–20.

---

10. In carrying out the Reorganizations Acts, the State Board promulgated guidelines includ-

Based upon this evidence, and upon the record as a whole, we find that the district court's constitutional violation finding was not clearly erroneous and, indeed, was fully supported by the record.

### B. *The Multidistrict Remedy*

■ Defendants argue that the district court abused its discretion by consolidating the five school districts of Churchill, Edgewood, Swissvale, Turtle Creek, and GBASD into one desegregated district. We disagree.

We have noted before that "[i]n litigation as long and complex as this, the fashioning of relief should normally 'be entrusted in large measure to the sound discretion of the District Court Judge who has lived with [it] for so many years.'" *Hoots V*, 639 F.2d at 979, *quoting Gilmore v. City of Montgomery*, 417 U.S. 556, 577, 94 S.Ct. 2416, 2427, 41 L.Ed.2d 304 (1977) (Marshall, J., concurring). Furthermore, we said that

> [i]t is important to recognize that, as a reviewing court, we are not empowered to consider the matter *de novo.* The approval of a desegregation plan is committed to "the exercise of the district judge's discretion ... [and] a school desegregation case does not differ fundamentally from other cases involving the framing of equitable remedies to repair the denial of a constitutional right." *Swann v. Board of Education*, 402 U.S. 1, 15–16 [91 S.Ct. 1267, 1275–76, 28 L.Ed.2d 554] ....

*Evans v. Buchanan*, 582 F.2d 750, 760 (3d Cir. 1978) (further citations omitted).

The controlling standards for examining the propriety of an interdistrict remedy were laid down by the Supreme Court in *Milliken*:

> The controlling principle consistently expounded in our holdings is that the scope of the remedy is determined by the nature and extent of the constitutional violation. *Swann*, 402 U.S. at 16 [91 S.Ct. at 1276]. Before the boundaries of the separate and autonomous school districts may be set aside by consolidating the separate units for remedial purposes or by imposing a cross-district remedy, it must first be shown that there has been a constitutional violation within one district that produces a significant segregative effect in another district. Specifically, it must be shown that racially *discriminatory acts of the state or* local school districts, or of a single school district have been a substantial cause of interdistrict segregation. Thus, an interdistrict remedy might be in order where the racially discriminatory acts of one or more school districts caused racial segregation in an adjacent district, *or where district lines have been deliberately drawn on the basis of race.*

418 U.S. at 744–45, 94 S.Ct. at 3126–27 (emphasis added).[11]

In *Milliken* the Court held that a federal district court should not have ordered fifty-

---

ing one stating that "[r]ace ... *shall not be [a] factor* [ ] in determining administrative boundaries." *See* note 3 *supra.* In drawing the boundary lines in central eastern Allegheny County, State and County Board members admittedly applied a segregation "blind" interpretation of the guideline. That is, they pretended that they could be totally *oblivious* to race as a consideration—even if that meant that there would be greater segregative effects as a result of their actions. They adopted that stand despite their knowledge that such an interpretation conflicted with the State Human Relations Commission regulations and state policy and would result in the perpetuation and aggravation of pre-existing segregation in the central eastern area. *Hoots II*, 359 F.Supp. at 818–19. The district court concluded that the Boards' adoption of this blatantly unacceptable and counter-intuitive interpretation of the "race" guideline provided circumstantial proof that the Boards' otherwise-inexplicable choice of

this interpretation was invidiously motivated. We agree.

**11.** *Milliken* also requires that "a meaningful opportunity for the included neighboring school districts to present evidence or be heard on the propriety of a multidistrict remedy or on the question of constitutional violations by those neighboring districts" be afforded to the school districts. 418 U.S. at 721–22, 94 S.Ct. at 3116 (footnote deleted). Here such a "meaningful opportunity" was afforded at all times. To the extent that the defendant school districts were precluded, after the district court's liability decision in 1973 in *Hoots II*, from arguing the question of whether there was intentional racial discrimination, we adhere to our earlier holding that the school districts' post-1973 intervention motions were untimely, *see Hoots III, supra*, 495 F.2d at 1097, and we reject the defendants' argument that the district court's

three suburban school districts to participate in the desegregation of the Detroit schools. The Court was concerned that the relief granted in that case was totally disproportionate to the "nature and extent of the constitutional violation." 418 U.S. at 744, 94 S.Ct. at 3127. Because the district court had received evidence of *de jure* segregated conditions in the Detroit schools, the Court reasoned that "[t]o approve the remedy ordered ... would impose on the outlying districts, not shown to have committed any constitutional violation, a wholly impermissible remedy." 418 U.S. at 745, 94 S.Ct. at 3127.

In this case, unlike *Milliken*, the court tailored the relief granted to fit the actual showing of *de jure* discrimination by *all* of the districts involved. Indeed, the remedy fashioned by the district court here was narrowly drawn.[12]

The district court granted relief after finding that the State and County Boards intentionally created GBASD and its neighbors as identifiably black and white districts, and that this interdistrict violation conducted by the State occurred during the reorganization process in the 1960's and "included the redrawing of school boundaries in that part of [*i.e.*, central eastern] Allegheny County." *Hoots VI*, 510 F.Supp. at 619. Furthermore, the district court quite clearly found the constitutional violation to be "the manner in which the school district lines were drawn," including both the racially motivated refusal of County and State Boards to exercise their "expressly retained ... power to force further merger" of GBASD's component municipalities with the surrounding white municipalities, and "the very elimination [of GBASD] from consideration for merger with [the predominately white] districts." *Id.* at 620–21.

The court thus located and defined the *de jure* constitutional violation. Its explication of that violation was unambiguous. It proceeded to examine explicitly the dictates

of *Milliken* and its progeny, and concluded that school districts in central eastern Allegheny County were created as part of the constitutional violation and that "[a] multi-district remedy can be applied to [those] surrounding districts [whose] boundaries were drawn or redrawn during the course of the same violation which reacted the segregated school districts." *Id.* at 619.

■ Thus, it was rational for the court to conclude that an interdistrict remedy was appropriate in this case because it concluded that the violation itself was interdistrict in nature. That such a remedy is totally in harmony with *Milliken* is stressed by Justice Stewart in his concurrence in that case:

This is not to say, however, that an interdistrict remedy of the sort approved by the Court of Appeals would not be proper, or even necessary, in other factual situations. Were it to be shown, for example, *that state officials had contributed to the separation of the races by drawing or redrawing school district lines*, see *Haney v. County Board of Education of Sevier County*, 429 F.2d 364; cf. *Wright v. Council of the City of Emporia*, 407 U.S. 451 [92 S.Ct. 2196, 33 L.Ed.2d 51]; *United States v. Scotland Neck Board of Education*, 407 U.S. 484 [92 S.Ct. 2214, 33 L.Ed.2d 75]; by transfer of school units between districts, *United States v. Texas*, 321 F.Supp. 1043, aff'd, 447 F.2d 441 [ (5th Cir.) ]; *Turner v. Warren County Board of Education*, 313 F.Supp. 380; or by purposeful, racially discriminatory use of state housing or zoning laws, then a decree calling for transfer of pupils across district lines or for *restructuring of district lines might well be appropriate*.

418 U.S. at 755, 94 S.Ct. at 3132 (emphasis added). *See also, e.g., Evans v. Buchanan*, 416 F.Supp. 328, 340 (D.Del.1976), aff'd, 555 F.2d 373 (3d Cir. 1977) ("Where the State has contributed to the separation of races by redrawing school lines, necessarily the

---

decision should be reversed for failure to join necessary parties under Fed.R.Civ.P. 19.

12. We believe it bears repeating that Chief Judge Weber has very ably dealt with all of the intricate, complex, and hotly contested issues in this case since 1971.

districts on both sides of the lines are part of the violation itself." ); *Penick v. Columbus Bd. of Ed.*, 429 F.Supp. 229, 266 (S.D. Ohio 1977), *aff'd*, 583 F.2d 787 (6th Cir. 1978), *aff'd*, 443 U.S. 449, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979) ("Actions and omissions by public officials which tend to make black schools blacker necessarily have the reciprocal effect of making white schools whiter." ).[13]

■ The district court having found a constitutional violation and having properly determined that an interdistrict remedy was appropriate because the violation was committed in the process of drawing school district lines, we believe that the burden of proof shifted to each defendant school district to establish that that district in particular was not involved in the violation. *See Keyes, supra,* 413 U.S. at 208–10, 93 S.Ct. at 2697–98 (burden of proof may be shifted to defendants in proper circumstances for reasons of fairness and policy); *Evans v. Buchanan,* 582 F.2d 750, 764–66 (3d Cir. 1978) (en banc) (where *de jure* segregation is established, and where placing burden on plaintiffs to show precise incremental segregative effect would leave them without a remedy, burden shifts to defendants), *cert. denied,* 446 U.S. 923, 100 S.Ct. 1862, 64 L.Ed.2d 278 (1980).

■ We have carefully considered the contentions of each of the defendant school districts that the district court was clearly erroneous in determining that their noninclusion in a district with the GBASD was due to racial considerations. In light of the burden of proof, we are not persuaded that the district court committed error in rejecting the defendants' claims that not race but factors such as "transportation difficulties," the quality of the school districts' curricula, and so on, lay behind the noninclusion of Edgewood, Swissvale, Turtle Creek, and Churchill. *See Keyes, supra,* 413 U.S. at 210, 93 S.Ct. at 2698 (once burden is shifted to defendants, "it is not enough, of course, that the school authorities rely upon some allegedly logical, racially neutral explanation for their actions").[14]

13. The district court also properly held that the State and County Boards violated the constitution in the manner in which the school district lines were drawn and so all surrounding districts can be implicated in a remedy, despite their alleged lack of involvement in the process.

"Where the State has contributed to the separation of races by redrawing school lines, necessarily the districts on both sides of the lines are part of the violation itself, *and exclusion of the suburban districts cannot be predicated on their own purported innocence when their present lines were drawn or redrawn in the course of a violation.*"

*Hoots VI,* 510 F.Supp. at 620, *quoting Evans v. Buchanan III,* 416 F.Supp. at 340. In any event, the district court expressly found that "the surrounding districts" were *not* "innocent" of unconstitutional activity, since they "continually sought to avoid being included in a school district with [Braddock and Rankin] due to the high concentration of blacks" in those areas. *Hoots VI,* 510 F.Supp. at 620–21.

14. Churchill argues strenuously that it stands in a different position from any of the other defendants. First, it argues that the school district reorganization in central eastern Allegheny County was finally completed under Act 150, and that Act 150 contained a "grandfather clause" which protected any school district created before the passage of Act 150 from being consolidated against its wishes with another school district. As Churchill was created out of the consolidation of three smaller districts before Act 150 was passed, and as Act 150 was never itself attacked as racially discriminatory, Churchill concludes, the district court had no basis for holding that the failure to include Churchill in a larger district was based even in part on racial considerations. We agree with the district court, however, that "[t]his argument is without merit since the constitutional violation was not only committed under Act 150, but pursuant to the entire reorganization process that began with Act 561." *Hoots VI, supra,* 510 F.Supp. at 621.

Second, Churchill points to a statement by the continued district court in a Memorandum and Order dated November 18, 1977, that "no evidence exists of a deliberate, purposeful, segregative intent in the creation of the Churchill district that would subject it to an interdistrict remedy to achieve racial balance." Appendix 841a. As we read the district court's statement, however, it merely indicates that the formation of Churchill out of Wilkins, Forest Hills, and Chalfant (all of which were white districts) was not racially motivated. That statement, however, is no different from Edgewood's argument that its lack of desire for a merger with another white district—Swissvale—disproves any racial motivation. Both

In its April 28, 1981 opinion, rendered after the April 20–21 hearings, the district court set forth very clearly its reasons for the remedy in question:

(1) It would produce a district with a school population 83% white and 17% minority (mostly black), within a general range of recognized desegregation guidelines and comparable to the population distribution over a wide area of Allegheny County.

(2) The pattern of desegregation established is likely to remain stable.

(3) All of the districts included are contiguous to each other, three of the districts border General Braddock, and the remaining district, Edgewood, borders one and almost borders another.

(4) The area of the New District is moderate in size (13.5 sq. miles) as compared to the average size of Allegheny County Districts (15 sq. miles).

(5) The district is roughly circular in configuration, lending itself to increased administrative and transportation efficiencies.

(6) All points in the district are within 2.5 miles radius of its center, and the greatest diameter from one edge of the district to the other is less than 5 miles.

(7) Student population density of the New District would be 821 per square mile, a high density compared to the 275 per square mile density of the average Allegheny County School District (excluding the City of Pittsburgh).

(8) Student population of the New District would be 9,132 in 1981, which exceeds the minimum of 4,000 students mandated for merged districts under the statutory and regulatory guidelines of the Commonwealth of Pennsylvania.

(9) Student enrollment in all of the merged districts has been declining at a rate exceeding 35% in the past ten years, and from the student population figures in grades from kindergarten to 12th grade may be expected to decline at a comparable rate in the next eight years, all of which indicates a need for consolidation to achieve educational efficiency and economy.

(10) All of the merged districts have excess capacity, in most cases substantial, at all instructional levels, making the excess capacity for the New District 40%. This will increase as the student population continues to decline. This excess capacity could be greatly reduced by the merging of these districts, the merging of student population, the discontinuance of old buildings requiring extensive repairs, allowing for a better organized comprehensive educational program without additional cost, and the possibility of very substantial savings in costs, as well as achieving desegregation.

(11) The New District will be strongly interconnected by available transportation arteries, and the relatively short distances between most parts of the district will minimize the time and mileage involved in any additional transportation needed.

(12) The existing transportation facilities of the merged districts, should be adequate to serve the transportation needs of the New District.

(13) Inasmuch as a substantial number of public school students in the present district are bussed, and because of the limited distances in the New District, it is not contemplated that any large increase in the total mileage or number of students transported will result from the consolidation.

(14) The proposed New District will be financially viable, having a higher tax base per student than the state average, and higher than some of the present districts included.

arguments miss the point: whether a school district desires to merge with other white districts (as in the case of the three which merged to form Churchill), or does not (as in the case of Edgewood and Swissvale), says little about whether that district's failure to be included in a still larger district along with GBASD, was due to racial considerations. Thus the district court's 1977 observation in no way undermines the district court's present conclusion that it was not simply under Act 150 but in the entire process of reorganization from Act 561 on that the violation occurred.

*Hoots VIII* at 6–8; Appendix at 889a–891a.[15]

15. The district court also gave reasons for inclusion of each individual district in the new district:

(1) *General Braddock*: This district must be in any remedy because its intentional creation as a racially identifiable black school district constituted the constitutional violation found in this case. Its 64% black student population in a larger area where the surrounding districts vary from less than 1% to a maximum of 13% black makes it mandatory for inclusion. It has continued serious financial problems that make its future as a viable district uncertain.

(2) *Turtle Creek* is included because it is contiguous to the General Braddock area, and also contiguous to Churchill which is also included in the New District. It is racially identifiable as a white school district (98%), it is small in area (1.37 miles), and has a high density of pupils per square mile (920), it has significant unused building capacity, particularly in its high school, and has experienced dropping enrollment and faces a continuing decline. Its present 1,200 student population in the face of a state standard of 4,000 students required for an adequate educational program renders its future as a viable independent school district cloudy. It has adequate transportational connection with the rest of the New District. It has close community business and occupation ties with the General Braddock Area District and also with the Churchill Area. It faces the same economic problems as the General Braddock district.

(3) *Churchill* is included because it is contiguous to General Braddock, as well as contiguous to Turtle Creek, Swissvale, and almost if not actually contiguous to Edgewood. It is identifiable as a 99.2% white school district. It has excess capacity in its facilities and declining enrollment. Its geographical position puts it in the heart of the New District, and its exclusion from the compact formation of the New District would make all of the consideration of geographical contiguity and compactness of the New District meaningless. Its economic strength would add financial stability to the new district.

(4) *Swissvale* is included because it is contiguous to the General Braddock Area District, as well as contiguous to Churchill and Edgewood in the New District, it is small in geographic area but with a high density of pupils per square mile (771), it is small in student population (1,757), below the minimum state standard requiring consolidation, and its student population. It has many connecting arteries of transportation with the rest of the New District. Its exclusion would result in a large vacuum between the other areas of the New District because of its central position in the configuration and its nexus of transportation arteries connecting other parties of the New District.

(5) *Edgewood* is included because it is identifiable as a white school district (98%) in a general area the composition of which is 17% black, and where the adjoining district, Swissvale is 13% black, its very small geographic size, ($\frac{1}{2}$ sq. mile), its high student population (731), which has declined and will continue to decline, and its substantial underutilization of facilities. It is close to many other schools in the New District, and has ready transportation access to the other areas included in the consolidation. We recognize that Edgewood was granted an exemption from the 4,000 minimum student population requirement after much litigation, but its student population has continued to decline. It is highly commendable that this district has been able to attract 100 tuition students from Pittsburgh and other districts to help fill the underutilized facilities, and that it is able to receive $1,000 or $1,200 per tuition student in this process, bringing substantial additional revenue to the district. However, it is possible for Edgewood to educate these additional students at a figure much less than the average cost of education per pupil because of the economic law of marginal cost, no increase of operating costs is involved in the utilization of the empty classroom seats. However, in so doing Edgewood has entered the business of private education of its own residents. This is contrary to the Commonwealth's school district reorganization policy. Edgewood's inclusion rounds out the compact shape of the district, and adds financial stability to the New District.

All of these districts are properly subject segregation of the General Braddock Area School District because of their involvement in the violations which led to the creation of the General Braddock Area School District as set forth in our Opinion of March 5, 1981. Appendix at 892a–895a.

The 1980–81 percentages of black enrollment in the New School District's constituent parts are helpful in understanding the desegregative purpose and effect of the district court remedy:

| School District | 1980 1981 Enrollment | Black | % Black |
|---|---|---|---|
| Churchill | 3,342 | 27 | .8% |
| Edgewood | 731 | 16 | 2.2% |
| Gen. Braddock | 2,042 | 1,279 | 62.6% |
| Swissvale | 1,757 | 223 | 12.7% |
| Turtle Creek | 1,260 | 24 | 1.9% |
| Total | 9,132 | 1,569 | 17.2% |

Appendix at 3233a.

In a recent statement of the proper role of an appellate court in reviewing the trial

judge's exercise of his discretion, we stated that a judge abuses his discretion "only when the judicial action is arbitrary, fanciful, or unreasonable, or when improper standards, criteria, or procedures are used." *Evans v. Buchanan*, 555 F.2d at 378–79, citing *Lindy Bros. Builders, Inc. v. American Radiator and Standard Sanitary Corp.*, 540 F.2d 102, 115–16 (3d Cir. 1976) (en banc). Using this standard of review, we find that the district court did not abuse its discretion in fashioning its multidistrict remedy. Indeed, the district court's action fully complied with all applicable standards and was supported by more than enough evidence.

### CONCLUSION

For the foregoing reasons, the judgments of the district court will be affirmed.